138 N.J. Super. 275 (1975)
350 A.2d 520
LANSCO, INC., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE STATE OF NEW JERSEY; DAVID J. BARDIN; JOHN W. VERNAM; EDWARD J. FAILE; ROYAL GLOBE INSURANCE COMPANIES; NEWARK INSURANCE COMPANY; AND DUANE MARINE CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided December 4, 1975.
*277 Mr. Charles Rodgers for plaintiff (Messrs. Breslin & Breslin, attorneys).
Mr. Lawrence Weintraub for defendants Royal Globe and Newark Insurance Companies.
Mr. Vincent J. Dotoli for defendant Duane Marine Corporation, James J. Rea, Jr., Esq., appearing.
GELMAN, J.S.C.
This declaratory judgment action was instituted by Lansco, Inc. (Lansco) against, among others, its insurance carriers Royal Globe Insurance Companies and *278 Newark Insurance Company (collectively referred to as Royal) to establish coverage under a comprehensive general liability insurance policy issued by Royal for costs incurred by Lansco in cleaning up an oil spill.[1]
The essential facts are not disputed. Lansco leases premises bordering the Hackensack River at 275 W. Fort Lee Road, Bogota, New Jersey, where it maintains tanks for the storage of asphaltic oil. Sometime during the night of December 29, 1974 a person or persons unknown opened the valves on two storage tanks, causing some 14,000 gallons of oil to leak from the tanks and onto Lansco's property. Vandalism was suspected and the police were contacted, but to this date investigation of the incident has failed to determine how it was caused. The only testimony in regard to the specifics of the occurrence was that a key required to open the valves, which was usually kept in a locked building overnight, was found on the ground near the tanks on the morning of December 30.
The oil leaked from the tanks onto the ground and made its way into two storm drains located on Lansco's property and which in turn empty into the Hackensack River. The incoming high tide carried the oil approximately five miles upstream to the vicinity of the Oradell Reservoir. The Department of Environmental Protection (DEP) was notified of the spill by both Lansco and a sanitary inspector of the Township of Teaneck who, after observing the oil in the river, followed it downstream until he located its source during the afternoon of December 30.
*279 In response to the calls to DEP Edward J. Faille, Sr., an employee of DEP, arrived at Lansco's premises to investigate the occurrence on December 30. He provided Lansco with printed copies of N.J.S.A. 58:10-23.1 et seq. and N.J.S.A. 23:5-28, and he informed it that under these statutes Lansco was obligated to clean up the oil spill. Lansco was also told that if it did not itself undertake to clean up the spill, the State would arrange to do so and bill Lansco for the costs and levy fines.[2]
The pertinent parts of the statutes, copies of which were given to Lansco, are as follows:
The discharge of hazardous substances, debris and petroleum products into, or in a manner which allows flow or runoff into or upon the waters of this State and the banks or shores of said waters is prohibited. [N.J.S.A. 58:10-23.4]
Any person responsible for discharging petroleum products, debris or hazardous substances in the manner prohibited by section 4 shall immediately undertake to remove such discharge to the department's satisfaction. If the person responsible fails immediately to undertake to remove the discharge to the department's satisfaction, the department may undertake the removal of such discharge and may retain agents and contractors for such purpose who shall operate under the direction of the department. The department may authorize a third person, affected by such an unlawful discharge, to expend funds to remove said discharge at the expense of the person responsible for same. [N.J.S.A. 58:10-23.5]
Any person who has discharged any petroleum products, debris, or hazardous substances into the waters of this State and is therefore responsible for removing same from said waters and shall be liable for moneys expended for the removal of said discharges by (a) himself, (b) the department, and (c) third persons so authorized by the department, but not to an extent greater than $14,000,000.00, except that where the department can show such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the person responsible, such person shall be liable for the full amount of the costs. Nothing herein shall be deemed to exclude or impair any other liability imposed by law. [N.J.S.A. 58:10-23.7]
*280 No person shall put or place into, turn into, drain into, or place where it can run, flow, wash or be emptied into, or where it can find its way into any of the fresh or tidal waters within the jurisdiction of this State any petroleum products, debris, hazardous, deleterious, destructive or poisonous substances of any kind; ... A person violating this section shall be liable to a penalty of not more than $6,000 for each offense ... If the violation is of a continuing nature, each day during which it continues shall constitute an additional, separate and distinct offense. The department is hereby authorized and empowered to compromise and settle any claim for a penalty arising under this section in such amount in the discretion of the department as may appear appropriate and equitable under all of the circumstances. [N.J.S.A. 23:5-28].
After ascertaining that Lansco did not itself have the capability to contain and clean up the spill, Faille provided Lansco with a list of contractors who could do so. Lansco selected Duane Marine Corporation, and by that same afternoon Duane Marine had employees on the scene and commenced the clean-up operation.
The next day, December 31, Lansco's insurance broker, Frank Bolen, and Dennis Keohane, Royal's insurance adjuster, arrived at the scene to investigate the occurrence. Throughout the approximately one-month period required to clean up the oil spill, Royal was aware of the work in progress and the costs Lansco was incurring for the work. However, Royal requested and Lansco executed a nonwaiver agreement on January 2, 1975, and throughout the period in question Royal reserved its rights on the coverage issue.
On March 4, 1975 Royal wrote to Lansco advising it that liability coverage did exist under the policy for damages for which it was legally obligated as a result of the oil spill. However, Royal denied coverage since it had determined that Lansco was not negligent, and that the applicable statutes did not impose such legal liability on Lansco to clean up the oil spill in the absence of its negligence. This suit was then instituted for a declaratory judgment that coverage did exist and for an order compelling Royal to pay all costs incurred by Lansco ($139,785 plus interest) to clean up the oil spill.
*281 Lansco's position is that under the comprehensive general liability provisions of its insurance policy with Royal there is coverage for this occurrence. The pertinent provisions of the policy read as follows:
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * * property damage to which this insurance applies caused by an occurrence ...

* * * * * * * *
Exclusions. This insurance does not apply:

* * * * * * * *
(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.[3]
The policy defines an "occurrence" as an accident "which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."
Royal's denial of coverage is based on the following grounds: (1) the occurrence was neither sudden nor accidental within the meaning of the exclusion clause quoted above; (2) coverage does not extend to statutory liability for damages recoverable by the State for injury to the environment, and (3) the statutes in question do not impose legal liability on Lansco in the absence of its negligence or fault.
As to Royal's first point, the occurrence during the night of December 29 was both sudden and accidental within the ordinarily accepted meaning of those words. In the absence of a specific definition in the policy, the words used by the insurer must be interpreted in accordance with the plain, ordinary and commonly understood meaning of the *282 language employed. Edgewater Nat'l Bank v. Safeguard Ins. Co., 81 N.J. Super. 383, 388-389 (App. Div. 1963); Wilkinson v. Providence Washington Ins. Co., 124 N.J. Super. 466, 469 (Law Div. 1973); Den Gre Plastics Co., Inc. v. Travelers Indem. Co., 107 N.J. Super. 535, 538 (Law Div. 1969). See Cooper v. Government Employees Ins. Co., 51 N.J. 86, 93 (1968).
"Sudden" means happening without previous notice or on very brief notice; unforeseen; unexpected; unprepared for. Webster's New International Dictionary (2 ed. unabridged 1954); Black's Law Dictionary (4 ed. 1968). "Accidental" is defined as happening unexpectedly or by chance; taking place not according to usual course. Webster's New International Dictionary and Black's Law Dictionary, supra; Furr v. Metropolitan Life Ins. Co., 111 N.J. Super. 596, 600 (Law Div. 1970); see Linden Motor Freight Co. v. Travelers Ins. Co., 40 N.J. 511 (1963). Further, under the definition of "occurrence" contained in the policy, whether the occurrence is accidental must be viewed from the standpoint of the insured, and since the oil spill was neither expected nor intended by Lansco, it follows that the spill was sudden and accidental under the exclusion clause even if caused by the deliberate act of a third party.
Royal urges, however, that coverage under the policy does not include damages recoverable by the State from Lansco in the State's sovereign capacity or under the public trust doctrine; in other words, the term "property damage" must be read as meaning measurable damage to identifiable physical property. The argument is without merit. It has long been established that the sovereign's interest in the preservation of public resources and the environment enables it to maintain an action to prevent injury thereto. E.g., Georgia v. Tennessee Copper Co., 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) (suit to prevent discharge of noxious fumes across state border); Missouri v. Illinois, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901) (suit to enjoin discharge of sewage *283 into Mississippi River). Cf. Neptune City v. Avon-by-the Sea, 61 N.J. 296 (1972).
More recently the courts of this jurisdiction and elsewhere have recognized that the state has the right to obtain damages for an injury to public resources and the environment. State v. Jersey Central Power & Light, 125 N.J. Super. 97 (Law Div. 1973), aff'd 133 N.J. Super. 375 (App. Div. 1975), certif. granted 68 N.J. 161 (1975) (damages awarded to State for destruction of fish caused by sudden discharge of cold water into tidal waters); Maine v. M/V Tamano, 357 F. Supp. 1097 (D. Maine S.D. 1973) (holding State has sufficient independent interest in its coastal waters and marine life to maintain suit as parens patriae for damages caused by oil spill); Maryland v. Amerada Hess Corp., 350 F. Supp. 1060, 1066-67 (D. Md. 1972); see Note, 5 Seton Hall L. Rev. 394 (1974). As was said in Jersey Central:
The State has not only the right but also the affirmative fiduciary obligation to ensure that the rights of the public to a viable marine environment are protected, and to seek compensation for any diminution in that trust corpus. [125 N.J. Super. at 103]
The policy in suit provides for comprehensive general liability insurance. Numerous decisions of our courts have held that an insured should receive what he generally may be understood to have contracted for. Bryan Const. Co., Inc. v. Employers' Surplus Lines Ins. Co., 60 N.J. 375, 378 (1972); Cooper v. Government Employees Ins. Co., supra 51 N.J. at 93; Kievit v. Loyal Protect. Life Ins. Co., 34 N.J. 475, 488 (1961). As has so frequently been said, an insurance contract is essentially one of indemnification, and Lansco could have reasonably expected to be indemnified for any liability arising out of the operation of its business which was not specifically excluded. Lansco is engaged in a business which entails the storage of oil on property adjacent to the Hackensack River. The specific policy provision in question affords coverage for property damage arising *284 out of a sudden and accidental discharge of oil into a body of water. This should have alerted the insurer to the potential legal liability of its insured under state anti-pollution statutes which directly affected and regulated its business operations.
While in other settings the quantum of damage may be difficult to ascertain, compare Jersey Central, supra 125 N.J. Super. at 103, in this case the State, by virtue of N.J.S.A. 58:10-23.7, has fixed as the measure of damages the cost of eliminating the harmful substance from the waters of the State. Hence, the cost of the clean-up determines the amount Lansco became legally obligated to pay and the amount for which it is entitled to indemnification.
Royal's final point is that the statute in question does not impose any legal obligation on Lansco to clean up the oil spill, and hence it cannot recover the costs expended therefor. This argument presumes that the statutes impose liability upon Lansco only if its fault were shown. However, the language as well as the legislative history of the New Jersey Water Quality Improvement Act of 1971, N.J.S.A. 58:10-23.1 et seq., compel the conclusion that the act creates liability for the costs of removal of prohibited substances from waters of this State in the absence of fault.
As reflected in the act's findings, the Legislature emphasized its concern for maintaining environmental quality and to exercise the State's police powers to the fullest possible extent to achieve its goal. N.J.S.A. 58:10-23.2.[4] The only place that state of mind is mentioned is in § 7, which imposes greater potential liability for wilful negligence or misconduct. See generally, Bergman, "No Fault for Oil Pollution," 5 J. Maritime Law and Commerce 1 (Oct. 1973).
*285 In construing the New Jersey Air Pollution Control Code, which uses analogous language, the Appellate Division has stated:
The relief may be grounded upon a violation of § 2.1 of the Code. And in this connection intention or willfulness is not an essential ingredient of the offense. Social and economic problems have impelled the adoption of numerous "strict liability" penal statutes. Where the Legislature makes the commission or omission of an act penal regardless of intent, only the doing of the prescribed act need be shown. [Dept. of Health v. Concrete Specialties, Inc., 112 N.J. Super. 407, 411 (1970)]
N.J.S.A. 23:5-28, quoted supra, which prohibits discharge of deleterious substances into the waters of this State, has also been construed as imposing liability without fault. State v. Kinsley, 103 N.J. Super. 190 (Cty Ct. 1968), aff'd 105 N.J. Super. 347 (App. Div. 1969). Cf. Askew v. Amer. Waterways Operators, Inc., 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973) (holding state imposition of strict liability for damages from oil spill permissible and not preempted by federal Water Quality Improvement Act of 1970).
The legislative hearings held prior to the enactment of the New Jersey Water Quality Improvement Act of 1971 reinforce the view that this legislation was intended to create liability irrespective of fault on the part of the property owner.[5] As enacted the act contains but two exemptions from imposition of liability for removal of prohibited substances: discharge caused by act of God or by act of war. N.J.S.A. 58:10-23.10. At the hearings William C. Lund, Chairman of the Water Pollution Control Committee of the New Jersey State Chamber of Commerce, requested that the exemptions be enlarged to include riot, sabotage and vandalism. Public Hearings, supra at 51. And Leonard H. *286 Ruppert, Executive Director of New Jersey Petroleum Council, requested that the exemptions be expanded to include those in the comparable federal statutes, 33 U.S.C.A. § 1321 (f) (2) (D), and 33 U.S.C.A. § 1161(f) (2) (D), which specifically provide an exemption from liability for the property owner when the oil spill results from the act or omission of a third party. Public Hearings, supra at 61.
Neither proposal was incorporated into the act as passed. Thus the inference may fairly be drawn that the legislative intent here was to impose responsibility for removal of an oil spill on the person from whose property the oil was discharged, unless such discharge was caused by an act of God or of war. Hence, Lansco was legally liable for the costs of removal of the oil spill regardless of whether it was caused by Lansco or by some third party, and Royal is obligated to indemnify its insured.
At the trial Royal raised for the first time the issue of whether the charges made by Duane Marine were fair and reasonable. While Royal is not estopped to assert noncoverage, on the facts present here it is estopped from contesting the charges at this late date. Royal's representative was present at the site at the very outset of the clean-up operations, observed the work in progress, was periodically on the scene during the entire period, and received copies of the Duane Marine bills as rendered. Royal never questioned the reasonableness of the invoices, and it cannot now be heard to challenge them.
Moreover, Duane Marine is to receive the 1 1/2% per month interest it charged for the amounts in arrears. When an insurer fails to pay a claim for which it is legally obligated and some third party therefore suffers the loss of use of its money, compensation for interest charges is just. Small v. Schuncke, 42 N.J. 407, 415-416 (1964). See Busik v. Levine, 63 N.J. 351 (1973) (cases collected); Grober v. Kahn, 88 N.J. Super. 343, 350 (App. Div. 1965) rev. on other grounds 47 N.J. 135 (1966); Agnew Co. v. Paterson Bd. of Ed., *287 83 N.J. Eq. 49, 67 (Ch. 1914), aff'd 83 N.J. Eq. 336 (E. & A. 1914).
Legal fees incurred by Lansco in bringing this declaratory judgment action will likewise be assessed against Royal pursuant to R. 4:42 9(a) (6), and counsel for plaintiff will submit an affidavit of services for the purpose of fixing the amount thereof. See Pressler, Current N.J. Court Rules, Comment to R. 4:42-9.
NOTES
[1] Summary judgment was granted in favor of defendants Department of Environmental Protection of the State of New Jersey and two of its employees. The theory of the action against the Department was that through its employees it had wrongfully required Lansco to clean up the oil spill. Duane Marine Corporation, the company which had been engaged to clean up the oil spill, was also named as a defendant, and it counterclaimed against Lansco for the cost of the clean-up operation. Judgment was granted to Duane Marine Corporation on its counterclaim.
[2] Lansco paid a fine of $800 on May 14, 1975 assessed by DEP. An additional fine of $2500, assessed by the United States Coast Guard, is being contested.
[3] At the trial evidence was adduced that the general practice in the insurance industry is to write exclusion clauses dealing with this subject matter either in the form set forth above, which furnishes limited coverage, or in the form of a blanket exclusion.
[4] See New Jersey Public Hearings before Senate Committee on Air and Water Pollution and Public Health, March 1, 1971, remarks of Wendell R. Inhoffer, General Superintendent and Chief Engineer for the Passaic Valley Water Comm'n, at 66-68, 70-72; remarks of Oscar Sussman, President, New Jersey Public Health Ass'n, at 6-7.
[5] Numerous decisions in this State support the proposition that courts may freely refer to legislative history in ascertaining legislative intent. State v. Jersey Central Power & Light Co., 133 N.J. Super. 375, 386-88 (App. Div. 1975) (cases collected).