290 N.J. Super. 95 (1996)
675 A.2d 220
METEX CORPORATION, PLAINTIFF-APPELLANT,
v.
FEDERAL INSURANCE CO., WESTPORT INSURANCE CO. (FORMERLY PURITAN INSURANCE COMPANY), HUDSON INSURANCE CO., CONTINENTAL CASUALTY COMPANY, ERIC RE-INSURANCE, DEFENDANTS-RESPONDENTS, AND NORTH STAR RE-INSURANCE CORPORATION, INSURANCE COMPANY OF NORTH AMERICA, CIGNA PROPERTY & CASUALTY CO., NEW JERSEY MANUFACTURERS INSURANCE CO., THE CAMDEN FIRE INSURANCE ASSOC., GENERAL ACCIDENT INS. CO. OF AMERICA, NORTH RIVER INSURANCE CO., ATLANTA INTERNATIONAL INSURANCE CO., AFFILIATED FM INSURANCE CO., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 21, 1996.
Decided March 22, 1996.
Motions for Reconsideration April 1, 1996.
Granted April 22, 1996.
Decided April 26, 1996.
*97 Before Judges MICHELS, VILLANUEVA and KIMMELMAN.
Elizabeth A. Sherwin argued the cause for appellant (Anderson, Kill, Olick & Oshinsky, attorneys; Paul E. Breene and Jennifer D. Marell, of counsel; Ms. Sherwin, on the brief).
Thomas E. Hastings argued the cause for respondent Federal Insurance Co. (Smith, Stratton, Wise, Heher & Brennan, attorneys; Mr. Hastings, of counsel and on the joint brief).
Huhnsik Chung (Luce, Forward, Hamilton & Scripps) of the New York bar, admitted pro hac vice; and Golden, Rothschild & Spagnola, attorneys for respondent Westport Insurance Co. (Mr. Chung and William G. McGrath, of counsel and on the joint brief).
Vincent E. Riley argued the cause for respondent Hudson Insurance Co. (McElroy, Deutsch & Mulvaney, attorneys; Samuel J. Samaro, of counsel and on the joint brief).
Cushing O. Condon argued the cause for respondent Continental Casualty Company (Ford, Marrin, Esposito, Witmeyer & Gleser, attorneys; Mr. Condon and Henry G. Burnett, of counsel and on the joint brief).
Scott M. Seaman (Bates, Meckler, Bulger & Tilson) of the Illinois bar, admitted pro hac vice, argued the cause for respondent Eric Re-Insurance (Budd, Larner, Gross, Rosenbaum & Sade, Mr. Seaman and Mary F. Licari (Bates, Meckler, Bulger & Tilson) of the Illinois bar, admitted pro hac vice, attorneys; Carl Greenberg, Phillip J. Duffy, Mr. Seaman and Ms. Licari, of counsel; Ms. Licari on the joint brief).
Deborah T. Poritz, Attorney General, attorney for amicus curiae State of New Jersey, Department of Environmental Protection (Mary C. Jacobson, Assistant Attorney General, of counsel; Karen J. Jordan, Deputy Attorney General, on the brief).
*98 Wiley, Rein & Fielding; and Hughes & Hendrix, attorneys for amicus curiae Insurance Environmental Litigation Association; (Laura A. Foggan, Daniel E. Troy, Stephen D. Goldman, Luis de la Torre, Gerald A. Hughes and Renee Pozzuoli Buecker, of counsel; Mr. Hughes and Ms. Buecker, on the brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D. (retired and temporarily assigned on recall).
The only question presented in this interlocutory appeal is whether comprehensive general liability policies afford insurance coverage for the costs of cleaning up environmental contamination absent a legal demand or directive from the New Jersey Department of Environmental Protection (DEP) for the cleanup or a claim by a third party.

I.
In 1968 plaintiff Metex Corporation began using trichloroethylene (TCE), an industrial cleaning and degreasing solvent, in the course of its wire mesh manufacturing operations at its facility on New Durham Road in Edison, New Jersey (New Durham). Plaintiff stored the TCE in two above-ground storage tanks on the New Durham site. In 1975, plaintiff installed a system manufactured by VIC Manufacturing Company (VIC unit) to allow it to recover and reuse spent TCE.
In the early 1980s, plaintiff became concerned that the manner in which it stored TCE and other hazardous substances at the New Durham site be in compliance with state and federal environmental regulations. As early as 1983, plaintiff had engaged an environmental consulting firm to develop a spill prevention plan for New Durham. Unhappy with what plaintiff perceived as that firm's lack of responsiveness, plaintiff hired another firm, Fanning Phillips & Molnar (FPM), to perform a data review and environmental audit report for the site. In June, 1985, FPM advised plaintiff that the discharge from the VIC unit contained high levels of TCE. In January 1986 FPM determined that there had *99 been a discharge of TCE to the waters of the State. Accordingly, in February 1986 plaintiff reported to the DEP that plaintiff had "detected a measure of [TCE] in [the] condensate water" which it emptied into a sanitary sewer connected to the Middlesex County Utilities Authority. On February 21, 1986, a DEP representative made the first of two inspections of the New Durham site.
In September 1987 after plaintiff concluded that there was, in fact, groundwater contamination beneath the New Durham site, plaintiff again contacted the DEP. Plaintiff confirmed to the DEP that the 1986 inspection had revealed "no ongoing discharge and the company's process system had been modified to prevent a future discharge to the storm sewer"; advised the DEP that investigations conducted subsequent to its 1986 visit revealed TCE in the groundwater and "minor soil contamination"; and informed the DEP that it was considering "what additional investigatory steps are necessary and, thereafter, what remedial measures need to be taken to fully address this condition."
In 1988 plaintiff hired an environmental engineering firm, Woodward-Clyde Consultants (Woodward-Clyde), to delineate the environmental property damage at New Durham and to develop a remediation plan.[1] In July 1990 plaintiff contacted the DEP again and advised it that detailed investigation of the site revealed that the concentration of TCE in the deep aquifer underlying the New Durham site exceeded the DEP action levels. On March 15, 1991, plaintiff submitted Woodward-Clyde's Groundwater Investigation Report and Remedial Investigation Reports to the DEP.
During this period of time, there was no correspondence from the DEP to plaintiff. It was not until July 20, 1995, that the DEP first initiated any correspondence with plaintiff, offering it the opportunity to enter into a memorandum of agreement with the DEP regarding the contemplated cleanup.
*100 To date, plaintiff has not undertaken a cleanup of the New Durham site. No third party has ever threatened or filed a lawsuit against plaintiff regarding contamination of the site, nor is plaintiff under any order or agency directive to remediate the contamination. However, the DEP considers this case to be open and has not signed off on either the remedial investigation or the proposed remedial action.

II.
On June 6, 1990, plaintiff brought this declaratory judgment and breach of contract action after the defendant insurance companies refused to pay costs incurred by plaintiff to investigate and remediate environmental property damage both at its New Durham site and its facility located at Talmadge Road (Talmadge) in Edison. Plaintiff alleges that these costs are covered by the third-party comprehensive general liability (CGL) policies which it purchased from various insurance companies between January 1, 1971, and January 1, 1985.
On January 9, 1995, defendant insurance companies moved for summary judgment, arguing that plaintiff was not entitled to insurance coverage on its New Durham and Talmadge claims based solely on two grounds: (1) coverage was not triggered because the DEP had not initiated enforcement proceedings; and (2) there were no proofs of off-site contamination and the owned property exclusion precluded coverage for the cost of remediating contamination on the insured's property.
The trial court, therefore, stated that the defendants really make two arguments: (1) "there is no proof that any damage occurred beyond the boundaries of Metex owned property and, therefore, the owned property exclusion applies"; and (2) "even if damage went beyond the boundaries of Metex property and did damage to property owned by third parties, there is no indication that anybody is taking any action to establish a legal obligation on the part of Metex to do anything or to pay any damages."
*101 The trial court held that since neither the DEP nor any other claimant was asserting a claim for bodily injury or property damage, plaintiff had no present claim for third-party liability insurance coverage against the defendant insurance companies,[2] and plaintiff's declaratory judgment action was not ripe for adjudication. As a consequence, the trial court, without addressing the terms of the insurance policies or any other issue, dismissed the New Durham claim without prejudice. The trial court expressly provided that it was not limiting or otherwise adjudicating plaintiff's substantive rights; if, in the future, a third party were to assert a claim against plaintiff regarding the New Durham site, plaintiff would be free to initiate a coverage action with respect to that claim. Because the trial court found that there existed some evidence of contamination beyond the boundaries of the site, it denied that part of the motion which relied on the owned property exclusion.[3]
We granted plaintiff's motion for leave to appeal. Plaintiff filed its appellate brief together with a motion to supplement the record with a letter dated July 20, 1995, from the DEP regarding the New Durham site. The letter, an agency form letter which asked plaintiff to consider participating in a "Voluntary Cleanup Program," provided, in part, as follows:
The Department of Environmental Protection (Department) has been informed of a suspected release of hazardous substances on the above referenced property.... We are available to assist you in ensuring that the necessary cleanup activities are properly conducted. To obtain our assistance, we are offering you the opportunity to conduct cleanup activities at your property with the Department's oversight under the Voluntary Cleanup Program by entering into a Memorandum of Agreement with the Department.
The Memorandum of Agreement is a contract established between the Department and you or any party who wishes to investigate and/or clean up all or part of *102 a contaminated site. The Memorandum of Agreement will allow you or any party to come forward and to conduct a cleanup voluntarily.
Although defendants opposed plaintiff's motion to supplement the record, this court temporarily remanded the matter to the trial court to consider the significance, if any, of the DEP's July 20 letter. On October 16, 1995, the trial court concluded that the July 20 letter did not affect its earlier opinion. Accordingly, the trial court denied the application for reconsideration and advised this court as follows:
The basis for my ruling that plaintiff's Complaint as to the New Durham Road site should be dismissed without prejudice was the thought that the claim was not ripe for adjudication in that no one, not the D.E.P. or any third party, asserted any claims against [plaintiff]. Since the dismissal was without prejudice, [plaintiff's] claim could be reinstituted when and if someone alleged some form of responsibility on its part. As I understand the July 20 letter, that situation is unchanged.
After we issued an initial opinion on March 22, 1996, solely regarding whether plaintiff was "legally obligated to pay" for cleanup and remediation of the New Durham site, all insurance companies moved for reconsideration.[4] We granted the motion and then recalled our initial opinion.

III.

Whether Defendant Insurance Companies Agreed to Pay to Plaintiff the Costs of Remediating the Discharges of Hazardous Substances at the New Durham Site Without a Formal Directive or Third-Party Claim to Trigger Insurance Coverage.
The trial court's decision limited the insurance coverage provided by standard form third-party CGL insurance to costs incurred after an agency directive is issued or a third-party law suit is commenced.

1. Federal Insurance Co.'s Primary Policy

We find that there is no provision in the primary CGL insurance policy issued by Federal Insurance Co. (Federal) which so limits *103 the coverage provided. Under Federal's primary insurance policy, Federal promises to "pay damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under any contract or agreement because of: bodily injury or property damage caused by an occurrence."
It has already been determined in this State that amounts spent on environmental-response costs and remediation expenses constitute sums the insured would have to pay "`as damages' because of property damage, within the meaning of the CGL policies at issue." Morton Int'l, Inc. v. General Accident Ins. Co. of Am., 134 N.J. 1, 27, 629 A.2d 831 (1993), cert. denied sub nom. Insurance Co. of N. Am. v. Morton Int'l, Inc., ___ U.S. ___, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994). Thus, although defendants[5] now attempt to litigate the issue of whether environmental cleanup costs constitute "damages,"[6] in light of the Supreme Court's decision in Morton, the only question properly before this court is whether a policyholder is "legally obligated to pay" by virtue of the provisions of the Spill Compensation and Control Act (Spill Act), N.J.S.A. 58:10-23.11.
Defendants argue that the policyholder cannot legally be obligated "absent a current legal obligation to a third party." However, the policies purchased by plaintiff are "occurrence" policies which are premised upon the happening of an occurrence as defined in the policies. Unlike a "claims-made" policy in which *104 coverage is triggered by a claim brought by a third party, an occurrence policy has no third-party claim requirement. An insurer cannot retroactively convert an "occurrence" policy into a "claims-made" policy. See Sparks v. St. Paul Ins. Co., 100 N.J. 325, 495 A.2d 406 (1985).
Moreover, the language of an insurance policy is to be given its plain meaning in order to fulfill the objectively reasonable expectations of a policyholder, Morton Int'l, Inc. v. General Accident Ins. Co. of Am., supra, 134 N.J. at 27, 629 A.2d 831; any doubts as to the existence of coverage must generally be resolved in favor of the policyholder, Mazzilli v. Accident & Casualty Ins. Co., 35 N.J. 1, 8, 170 A.2d 800 (1961). Here, the language of Federal's primary CGL insurance policy does not require any "enforcement," "claim" or "suit" by a third party in order to entitle the plaintiff to coverage. Since there is nothing in the policy so limiting the coverage, a reasonable insured would assume that it is equally as legally obligated to comply with statutory mandates as it is to comply with an administrative directive or a court decree; in other words, the source of the legal obligation is of no consequence.
The Spill Act imposes strict liability for the costs of cleanup upon the responsible party:
Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the department or a local unit pursuant to subsection b. of section 7 of P.L. 1976, c. 141 (C.58:10-23.11f).
[N.J.S.A. 58:10-23.11g(c)(1).]
It is this statutory mandate that makes a polluter legally obligated to pay damages because of property damage. This liability arises upon the discharge of a hazardous substance onto the property. Under the Spill Act a polluter's strict liability is triggered by his pollution  not by whether or not an order is issued by the DEP. There is nothing in the language of the statute making the liability *105 dependent on DEP's knowledge or enforcement efforts. Even without an order from the DEP, an aggrieved party may sue and recover damages from the polluter.
Courts in other states have held that policyholders who are strictly liable for the investigation and remediation of environmental property damage are entitled to coverage even in the absence of a lawsuit, cleanup order or directive. For example, in Weyerhaeuser Co. v. Aetna Casualty and Surety Co., 123 Wash.2d 891, 874 P.2d 142 (1994), the policyholder sought coverage under several CGL policies for cleanup costs of approximately $28 million incurred at various polluted sites throughout the country. Weyerhaeuser filed a declaratory judgment action against several of its insurers seeking a declaration of coverage. The insurers filed a motion for summary judgment based on the contention that they had no liability absent an overt threat of formal legal action against the insured party. The trial court granted summary judgment with regard to fifteen of the sites since there was no claim by a third party of liability. Id. 874 P.2d at 144.
On appeal, Weyerhaeuser argued that "a policyholder does not have to stop its environmental cleanup efforts and wait to be sued in order to obtain the benefits of liability insurance policies it purchased to cover liabilities arising out of property damage when the policyholder already faces statutory liability because of environmental property damage." Id. 874 P.2d at 147. The insurers argued that absent some adversarial, coercive conduct by a government agency or other third party, no legal obligation was imposed on Weyerhaeuser which would trigger coverage under the policies. Id. 874 P.2d at 146-47.
The Washington Supreme Court acknowledged that Weyerhaeuser was cleaning up pollution "in cooperation with government environmental agencies" and noted that the cleanup efforts were in response to "various state and federal statutes which impose *106 strict, joint and several liability for pollution damage."[7]Id. 874 P.2d at 147. The court found that the plaintiff was no less legally obligated to pay damages under a strict liability environmental statute than when threatened with legal action by the regulating agency, id. 874 P.2d at 151, and held that Weyerhaeuser's policies could "reasonably be read to provide coverage for actions taken to clean up pollution damages required under environmental statutes which impose strict liability for such cleanup," id. 874 P.2d at 145.
Defendants contend that Weyerhaeuser is distinguishable in that Weyerhaeuser's claims were dismissed with prejudice while plaintiff's claims herein were dismissed without prejudice and can be brought at another time. In addition, defendants contend that environmental agencies were "closely monitoring" Weyerhaeuser's remediation efforts, whereas the DEP has had little involvement in this case. The following comments by the Washington Supreme Court respond to both of these issues:
The denial of coverage in this case is not just a statement that the claim is premature and could be asserted at a later time. If Weyerhaeuser cleans up after a government "request" (but before threat of legal action) then the threat of legal action (which the insurers argue is what triggers coverage) would never materialize. Hence, there could never be coverage. The following scenario occurs under the insurers' position. If pollution has damaged other property, and an environmental agency has told the landowners they are statutorily responsible to remedy the situation, but has not yet threatened suit, the policyholders have two options: (1) clean up and forgo any possibility of recovering from their liability insurance because of lack of overt threat or (2) refuse to negotiate with the agency and refuse to clean up and wait to be sued or to be threatened with suit. If the second option is taken the policyholder also may not have any insurance coverage (at least for damage that occurred after knowledge) because it has failed to mitigate its damage or because the pollution was expected or intended. Such an anomalous result would ... result in fundamental unfairness to policyholders who reasonably believed they had insurance coverage for certain kinds of property damage caused by pollution.
[Id. 874 P.2d at 153.]
*107 The Weyerhaeuser court relied in part on Bausch & Lomb Inc. v. Utica Mutual Insurance Co., 330 Md. 758, 625 A.2d 1021 (1993). In that case, the policyholder initiated investigative and remediative steps for TCE contamination of subsurface groundwater, without legal proceedings having been formally filed against it by any third party  although suit had been threatened by an adjoining owner  and without any agency directive. At various times during the cleanup, Bausch & Lomb met with State officials and the State reviewed the remediation plans. In those instances when the State disagreed with the plans, the parties negotiated a resolution. Id. 625 A.2d at 1025-26.
The insurance company sought a declaratory judgment that it had no obligation to defend or indemnify Bausch & Lomb, based, in part, on the premise that Bausch & Lomb voluntarily had incurred the costs associated with the investigation and site remediation. Maryland's highest court rejected the insurance company's argument:
[Bausch & Lomb] acted throughout in a cooperative manner with State regulators in assessing the pollution's extent and devising plans to treat it. It is less certain that [Bausch & Lomb] acted purely voluntarily in doing so. First, all parties concede that the relevant environmental statutes ... impose strict liability upon the owners of polluted property; the statutes further grant the State the authority to enforce the laws either by administrative order, by injunction, or by the State's own, direct remediation at the owner's expense. The tacit threat of formal State intervention was thus always present in [Bausch & Lomb's] dealings with the State regulators.
[Id. 625 A.2d at 1031-32.]
Defendants' reliance on McNeilab, Inc. v. North River Insurance Co., 645 F. Supp. 525 (D.N.J. 1986), aff'd, 831 F.2d 287 (3d Cir.1987), is misplaced because the insured therein was under no legal obligation, statutory or otherwise, to undertake the recall for which it sought insurance coverage.
Therefore, plaintiff preliminarily has established a cause of action for coverage against Federal under its primary policy subject to any other defenses Federal may have.

*108 (2) Umbrella and Excess Liability Insurance Policies

From 1972 to 1985, all of plaintiff's primary CGL insurance policies apparently contain the same basic insuring language: "The company will pay on behalf of the Insured all sums which the Insured shall became legally obligated to pay as damages because of bodily injury or property damage...."
The umbrella and excess liability insurance policies issued after 1978 apparently contain several different promises to pay damages the insured becomes legally obligated to pay, such as a promise to "indemnify [Metex] for ultimate net loss which [Metex] shall sustain by reason of liability imposed upon [Metex]... because of ... Property Damage ... to which this insurance applies." (Emphasis added.) Some of the policies expressly define ultimate net loss as "the sums paid or payable as damages in settlement of a claim or in satisfaction of a judgment for which [Metex] is legally liable after making proper deduction for all recoveries and salvages...."
The insurance companies now argue that even if this court's interpretation of the language contained in the primary CGL insurance policies is correct, that interpretation is inapposite to the different language set forth in the umbrella and excess liability insurance policies' "ultimate net loss" definitions. This issue was neither raised in nor decided by the trial court.
Plaintiff claims, however, that the two excess insurance policies issued by Continental Insurance Company (CNA) for the 1973 to 1978 policy years do not contain the "ultimate net loss" language and expressly incorporate the terms of the primary policies.
Regardless of whether the arguments by the insurance companies have merit, this opinion decides only plaintiff's coverage under Federal's primary CGL insurance policy. However, because the liability of all the other insurance companies under their umbrella and excess liability insurance policies has never been *109 addressed by the trial court, a remand is necessary to decide whether those policies provide coverage for the costs of environmental contamination cleanups absent a legal demand or directive from the DEP or a claim by a third party.

IV.

New Jersey Courts Have Held that Statutorily-Mandated Response Costs Are Covered By Standard Form Comprehensive General Liability Insurance Policies.
This court first visited the issue now before it when it decided Lansco, Inc. v. Department of Environmental Protection, 138 N.J. Super. 275, 350 A.2d 520 (Ch.Div. 1975), aff'd, 145 N.J. Super. 433, 368 A.2d 363 (App.Div. 1976), certif. denied, 73 N.J. 57, 372 A.2d 322 (1977). In that case, vandals released 14,000 gallons of oil onto Lansco's property, some of which made its way into two storm drains and then into the Hackensack River. Id. at 278, 350 A.2d 520. When a DEP inspector arrived at the site, he informed Lansco that it was obligated to clean up the oil spill, and he furnished the company with copies of the applicable statutes (precursors to the Spill Act). Lansco was told that in the event the State had to clean up the spill, Lansco would be billed for the costs and fines would be levied. Id. at 279, 350 A.2d 520.
Lansco thereafter cleaned up the oil and sought insurance coverage from its carrier for the expenditures. Lansco's insurance carrier denied coverage, in part because it asserted that Lansco was not legally obligated to undertake the cleanup. The trial court rejected the argument, id. at 284, 350 A.2d 520, and concluded that regardless of whether the oil spill was caused by Lansco or some third party, Lansco was legally obligated for the costs of cleanup, and the carrier was obliged to indemnify its insured. Id. at 286, 350 A.2d 520 In Lansco it was the existence  rather than the source  of the obligation which determined the applicability of insurance coverage.

*110 V.

Whether the Costs of Compliance With the Spill Act Constitute the Ordinary Costs of Doing Business.
Defendants contend that plaintiff's interpretation of the phrase "legally obligated to pay as damages" is so general that its adoption by this court would provide coverage for the ordinary costs of doing business. They argue that the costs of compliance with government regulatory actions form a part of a policyholder's business activities and are not the subject of liability insurance. Defendants' argument ignores the fact that some of the insurance policies provide insurance coverage only for amounts the policyholder becomes legally obligated to pay because of property damage. See Weyerhaeuser, supra, 874 P.2d at 149. This limitation eliminates any risk that insurance companies will be called upon to pay the ordinary costs of compliance with agency regulations.[8]

VI.

Whether Plaintiff's Costs Are Covered by the Insurance Policies on the Independent Ground that Such Costs Were Necessary to Mitigate Plaintiff's Damages.
Plaintiff argues that in the absence of the strict liability imposed by the Spill Act and its regulations, the costs incurred by plaintiff in the investigation and remediation of the contamination would be covered by the standard language of its liability insurance policies.
In State, Department of Environmental Protection v. Signo Trading International, Inc., 130 N.J. 51, 612 A.2d 932 (1992), the New Jersey Supreme Court confirmed that liability insurance policies provide coverage for loss mitigation costs where, as here, *111 off-site environmental property damage has occurred, stating "`[t]here is no novelty to the proposition that in a conventional tort action, once some present injury has been proved, the plaintiff's damages may include the cost of measures intended to prevent future injury.'" Id. at 63, 612 A.2d 932 (quoting Diamond Shamrock Chemicals Co. v. Aetna Casualty & Sur. Co., 231 N.J. Super. 1, 12, 554 A.2d 1342 (App.Div. 1989)).

VII.

Whether the Legal Obligation to Remediate Exists Under the New Jersey Environmental Statutes and Their Implementing Rules.
By fiscal year 1994, the DEP had compiled a Comprehensive Site List containing information on approximately 21,000 sites with known or suspected contamination. Of those sites, over 6,000 have confirmed contamination, another 5,670 require investigation to determine whether there is contamination, and the remaining 44% of sites require no further action at this time.
New Jersey's environmental legislation is intended to cast a wide net over contaminated sites to insure the preservation and remediation of the environment. The basis for New Jersey's site remediation program is that the person responsible for the hazardous substance is strictly liable under New Jersey statutes and rules for the costs associated with a discharge. See N.J.S.A. 58:10-23.11g(c)(1); State, Dep't Envtl. Protection v. Ventron Corp. 94 N.J. 473, 493, 468 A.2d 150 (1983) (holding that "those who poison the land must pay for its cure"). The obligation of responsible parties to come forward to do the work or pay the costs of cleanup is an integral element of New Jersey's strategy for the remediation of contaminated sites.
Under the Spill Act and the regulations promulgated thereunder, a responsible party has an affirmative obligation to report a discharge and to either clean it up or pay the costs of cleanup and removal, regardless of whether the DEP exercises its broad enforcement authority. Defendants contend that the Spill Act *112 does not provide that the responsible party shall clean up the discharge, but simply provides that the party may be required to clean it up. They argue that strict liability "arises only after the DEP cleans up a discharge or directs someone to clean up a discharge," and plaintiff has no liability or obligation absent such direction. We find no support for defendant's position.

A. The Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 (effective 1977).
Under the Spill Act, "[a]ny person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred." N.J.S.A. 58:10-23.11g(c)(1). The DEP has discretion to clean up and remove a discharge[9] itself, or it may direct the person responsible for the hazardous substance to do so:
Whenever any hazardous substance is discharged, the department may, in its discretion, act to clean up and remove or arrange for the cleanup and removal of such discharge or may direct the discharger to clean up and remove, or arrange for the cleanup and removal of, such discharge.... The department may monitor the discharger's compliance with any such directive. Any discharger who fails to comply with such a directive shall be liable to the department in an amount equal to three times the cost of such cleanup and removal....
[N.J.S.A. 58:10-23.11f(a)(1).]
A person who may be liable for a discharge must report it to the DEP. N.J.S.A. 58:10-23.11e. The DEP may also impose penalties of up to $50,000 a day or take other enforcement action for violations of the act. N.J.S.A. 58:10-23.11u.
Compliance with these statutes is not rendered optional by the default or neglect of DEP enforcement action. Such action is prioritized because of the large number of sites in relation to the number of available DEP enforcement personnel and by the inherent limitations of public funding. The legislative scheme, *113 implementing rules, and the DEP site remediation strategy require that the responsible party who is aware of the discharge come forward to remediate it. Therefore, a responsible party who waits for DEP enforcement before acting is violating the law.
The State explains that the DEP addresses contaminated sites where the responsible party does not comply with the applicable statute on a "worst-first" basis. Presumably, this could account for the fact that the DEP has failed to act in the past ten years with respect to the contamination at the New Durham site. However, if the New Durham site reaches the top of the list and plaintiff has not remediated the contamination, the DEP will initiate enforcement in the form of a directive under the authority of the Spill Act, N.J.S.A. 58:10-23.11f(a)(1). If at that time plaintiff does not sign an agreement to do the work or pay the costs for DEP to do the work, DEP will proceed to clean up the discharges and seek recovery from plaintiff of three times DEP's costs. N.J.S.A. 58:10-23.11f(a)(1).
If plaintiff failed to take action to investigate and clean up the discharge of TCE, the DEP could assess either civil administrative penalties or civil penalties of up to $50,000 for each day of violation of the Act, including violation of rules promulgated under the Act, N.J.S.A. 58:10-23.11u(c), and any such penalties could run from the date of the discharges, i.e., before 1986. If the DEP has to bring a judicial proceeding to enforce the obligation to clean up, the person responsible for the discharge must pay the DEP's litigation costs. N.J.S.A. 58:10-23.11u(b)(2). Plaintiff would also be required to pay the DEP's costs in preparing and successfully enforcing an administrative penalty assessment. N.J.S.A. 58:10-23.11u(c)(4).

B. Whether the Regulations Promulgated by the DEP Alter or Are Inconsistent With the Plain Terms of the Spill Act.
The Spill Act provides that the DEP may act to clean up and remove a hazardous substance discharge or may direct the responsible person to clean up and remove the discharge. However, regulations promulgated pursuant to the Spill Act require that *114 "[a]ny person responsible for a discharge shall take immediate action to stop the discharge and shall take all necessary and appropriate measures to contain, mitigate, cleanup and remove the discharge. ... All persons shall coordinate such actions with the Department." N.J.A.C. 7:1E-5.7(a) (emphasis added).
It is clear that strict liability is imposed by statute on "[a]ny person who has discharged a hazardous substance." See N.J.S.A. 58:10-23.11g(c)(1). Moreover, the New Jersey Supreme Court has indicated that the provisions of the Spill Act are to be given an expansive reading to accomplish the act's goals. See In re Kimber Petroleum Corp., 110 N.J. 69, 539 A.2d 1181 (1988) (noting the DEP's "broad authority" to require a person to pay in advance for the DEP's costs); State, Dep't Envtl. Protection v. Ventron Corp., supra, 94 N.J. at 496-97, 468 A.2d 150 (stating that the Spill Act "is quite comprehensive in scope"). Indeed, the Legislature itself has provided that "[t]his act, being necessary for the general health, safety, and welfare of the people of this State, shall be liberally construed to effect its purposes." N.J.S.A. 58:10-23.11x.
With respect to defendants' argument that the permissive "may" of the Spill Act is inconsistent with the mandatory nature of the regulations, we note that the original version of the statute, passed in 1976, provided that the DEP "shall" direct the responsible party to clean up a discharge or the DEP was required to perform the cleanup itself. The Legislature's statement accompanying the 1979 amendment to N.J.S.A. 58:10-23.11f(a) indicates that the statute was "amended to give the DEP the discretion to act to remove a discharge." Furthermore, this court has explained that a properly enacted regulation is presumed to be valid and should be "scrupulously" adhered to. Lister v. J.B. Eurell Co., 234 N.J. Super. 64, 78, 560 A.2d 89 (App.Div. 1989).

C. Whether Plaintiff's Participation Under A Proposed Memorandum of Agreement Is Voluntary and Precludes Insurance Coverage.
Defendants contend that in the ten years since contamination was detected on plaintiff's property, no government agency has *115 required it to clean up the site. Defendants point to DEP's letter to plaintiff dated July 20, 1995, as evidence that plaintiff is under no legal obligation to remediate the New Durham site until the DEP initiates an enforcement action. That letter did not alter plaintiff's statutory and regulatory liability.
A person who is liable under the Spill Act is liable for "all cleanup and removal costs." N.J.S.A. 58:10-23.11g(c)(1). "Cleanup and removal costs" are those costs incurred by any person with "written approval" from DEP. N.J.S.A. 58:10-23.11b(d). A memorandum of agreement is one of the means by which the DEP provides its written approval of costs. See N.J.A.C. 7:26C-3.1.[10] Plaintiff explains that if it were to enter into a memorandum of agreement for the investigation and cleanup of the New Durham site, the DEP would review and approve or disapprove its investigation to date, its proposed remedial action, and its report of the implementation of its action. See N.J.A.C. 7:26C; N.J.A.C. 7:26E. Since the DEP interprets the Spill Act to impose liability for investigative costs associated with the cleanup and removal of a discharge, and since a discharge cannot be addressed until the contaminants are defined and the extent of the discharge determined, some of the insurance policies obligate the insurers to indemnify plaintiff for the costs of work the DEP approves under a memorandum of agreement. N.J.A.C. 7:26C-1.3, definition of remediation; N.J.A.C. 7:26E-3.1 to -3.10, -4.1 to -4.9.

D. Public Policy Considerations Also Support Plaintiff's Position.
In Owens-Illinois, Inc. v. United Insurance Co., 138 N.J. 437, 472, 650 A.2d 974 (1994), the Supreme Court emphasized New *116 Jersey's strong public interest in providing incentives for people to "engage in responsible conduct" that would enhance, not diminish, the resources available to contend with environmental damage. As a consequence, the regulations promulgated under the Spill Act require that the property owner respond to the discovery of environmental property damage immediately, thus reserving the coercive power of administrative intervention for those property owners who fail to act on their own. See, e.g., N.J.A.C. 7:1E-5.7(a). Defendant insurance companies apparently would prefer that plaintiff continue to violate the law and risk liability for treble damages.
The trial court's ruling thwarts the objectives articulated in Owens-Illinois, Inc. by punishing the policyholder who responds to its statutory and regulatory legal obligation to rectify environmental property damage upon discovery and by delaying the availability of insurance proceeds needed by many policyholders to perform statutorily-mandated cleanups. Thus, contrary to established public policy in New Jersey, the trial court's ruling would either reduce the willingness of polluters to apply their financial resources for required environmental remediation or delay such remediation in the interest of preserving the availability of those financial resources for other purposes.
Although "public policy considerations alone are not sufficient to permit a finding of coverage in an insurance contract when its plain language cannot fairly be read otherwise to provide that coverage," State, Dep't Envtl. Protection v. Signo Trading Int'l, Inc., supra, 130 N.J. at 66, 612 A.2d 932, public policy considerations in combination with the plain language of the Spill Act and its regulations, the plain language of Federal's primary insurance policy, and the reasonable expectations of the policyholder require a finding of insurance coverage under Federal's primary insurance policy.

CONCLUSION
We reverse the dismissal of plaintiff's complaint against Federal predicated upon its primary CGL insurance policy subject to any *117 other defenses that Federal may have. We remand to the trial court for a determination of whether plaintiff has coverage under any of the umbrella or excess liability insurance policies consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] In March 1994 Woodward-Clyde estimated the capital costs of the remediation of ground water and soil at $3,144,000 and operation and maintenance costs at $430,000 per year. In August 1994 defendants' consultant, Anderson, Mulholland & Associates, Inc., submitted a report in which it estimated the capital costs at $1,783,000 and operation and maintenance costs at $1,579,000 for a ten-year period.
[2] Federal Insurance Co. is the only primary insurer involved in this litigation. Federal Insurance Co. also issued an umbrella liability insurance policy. All other insurance companies issued either umbrella or excess liability insurance policies.
[3] The court denied summary judgment with respect to the Talmadge site claim based on the degree of DEP involvement in the investigation and remediation of that property under ECRA.
[4] Federal, as the sole primary insurer, failed to mention anything about its primary policy in its letter brief on the motion but merely argued that our opinion erred in interpreting its umbrella liability policy.
[5] From the time the defendants' original motion for summary judgment was filed until oral argument in this court, the insurance companies have never contended that the primary and umbrella or excess insurance policies at issue should be interpreted differently with respect to the "legally obligated" issue. In fact, the insurance companies filed a joint brief herein in which they made no such distinction between the primary and umbrella or excess policies.
[6] In State, Dep't Envtl. Protection v. Signo Trading Int'l, Inc., 130 N.J. 51, 612 A.2d 932 (1992), the Court held that there is coverage for damage to the insured's property if off-site damage is shown and remediation of the insured's property is necessary to prevent further off-site damage. Here, the trial court found that there is at least a factual question whether there is off-site damage, whether or not a third-party owner has asserted a claim for it.
[7] Defendants attempt to distinguish Weyerhaeuser on the premise that in that case an environmental agency had already determined that the company was obligated to clean up the sites in issue. The Weyerhaeuser court did not make that distinction in its decision.
[8] Plaintiff acknowledges the difference between business expenses and compensable regulatory compliance costs and explains that upon discovering the discharge of TCE it took immediate steps to stem the discharge and prevent further discharges. Plaintiff claims that it has not sought insurance coverage for these non-compensable business expenses.
[9] "Discharge" is defined, in part, as "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State." N.J.S.A. 58:1-23.11b.
[10] This subchapter provides, in part, that

[i]f any person elects to perform any remedial phase(s) with the Department's oversight, at a site which the Department has not identified as a priority site and the site is not subject to ECRA, the remedial phase(s) shall be governed by a memorandum of agreement pursuant to this subchapter.
[N.J.A.C. 7:26C-3.1(b).]