**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3014-22

NORTH RIVER INSURANCE
COMPANY,

     Plaintiff-Respondent,

v.

CARDUNER FRONT, LLC,

     Defendant-Appellant.

_____

CARDUNER FRONT, LLC, and
ROBERT CARDUNER, individually
and as the Executor of the Estates of
JEAN and LUCY CARDUNER,

     Plaintiffs-Appellants,

v.

THE CONTINENTAL INSURANCE
COMPANY, THE GLENS FALLS
INSURANCE CO., and THE NORTH
RIVER INSURANCE COMPANY,

     Defendants-Respondents,

and

THE GREAT AMERICAN
INSURANCE COMPANY, THE
SENTRY INSURANCE COMPANY,
EAGLE STAR INSURANCE
COMPANY, THE NEW JERSEY
PROPERTY LIABILITY
INSURANCE GUARANTEE
ASSOCIATION, RAMP DRY
CLEANING, INC., and PAUL
GANGI,

     Defendants.[1]

_____

Argued September 17, 2024 – Decided July 8, 2025

Before Judges Gilson, Firko, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law
Division, Mercer County, Docket Nos. L-1947-14 and
L-2753-14.

Louis Giansante argued the cause for appellants
(Giansante & Assoc., LLC, attorneys; Louis Giansante,
of counsel and on the briefs).

Michael J. Tricarico and Jon R. Grabowski argued the
cause for respondents (Kennedys CMK LLP, attorneys
for North River Insurance Company; Jon R. Grabowski
(Ford Marrin Esposito Witmeyer & Gleser, LLP),
attorney for respondent Continental Insurance
Company, as Successor by Merger to the Glens Falls

---

[1]  Defendants The Great American Insurance Company, The Sentry Insurance
Company, Eagle Star Insurance Company, The New Jersey Property Liability
Insurance Guarantee Association, Ramp Dry Cleaning, Inc., and Paul Gangi
have settled their issues and are not participating in this appeal.

Insurance Company; Michael J. Tricarico and Jon R. Grabowski, on the joint brief).

PER CURIAM

In this insurance coverage dispute concerning a commercial property that was environmentally contaminated by the operation of a dry cleaning store, Carduner Front LLC and Robert Carduner, individually and as executor of the Jean and Lucy Carduner estates (Carduner Parties), appeal from six orders: three orders dated October 21, 2015 dismissing claims by the Carduner Parties against defendants North River Insurance Company (North River) and Continental Insurance Company (Continental) (collectively, the Carduner insurers); a November 27, 2018 order denying in part their cross-motion for summary judgment against North River and Continental; a March 31, 2023 order granting summary judgment to the Carduner insurers; and a May 11, 2023 order denying reconsideration of the March 31, 2023 order.

We affirm the three October 15, 2015 orders and the November 27, 2018 order. However, we reverse and vacate the March 31, 2023 order granting summary judgment to the Carduner Parties' insurers and the May 11, 2023 order denying reconsideration. We conclude the 2021 Settlement Agreement (the 2021 Agreement) did not resolve and does not resolve the Carduner Parties'

3

pending claims against North River or Continental. Consequently, we remand for further proceedings on those claims.

I.

A.

Background

Jean[2] and Lucy Carduner owned a shopping mall located on Routes 130 and 571 in East Windsor (the property), first as husband and wife and then as tenants in common. They leased space to Ramp Dry Cleaning, Inc. (Ramp). In 1987, Lucy died testate. After Lucy's death, her interest in the shopping center was conveyed to a trust for the benefit of her husband Jean.

On January 9, 1991, Jean died testate. When he died, "the [t]rust terminated by its terms and the property reverted to his estate for distribution under his will. Robert . . . was heir to the property under Jean's . . . will." Neither Lucy's nor Jean's estates have produced evidence of any payment or disbursement by the estates for the remediation of the contaminated property.

---

[2] Parties who share a last name with other individuals are referred to by their first names for the ease of reference. By doing so, we intend no disrespect.

B.

Insurance Policies Effective in the 1980's

North River issued the three comprehensive business liability policies to Jean and Lucy in their capacity as individuals and landlords of the property with a $1,000,000 per occurrence policy limit: (1) liability policy number 5101049097, effective from January 5, 1982, until January 5, 1985; (2) liability policy number 5104191573, effective from January 5, 1985, until January 5, 1986; and (3) liability policy number 5104191699, effective from January 5, 1986, until January 5, 1987. These three policies did not name or qualify any other Carduner Parties as insureds.

Glen Falls Insurance Company (Glen Falls), the predecessor to Continental, issued policy CBP68982, which was effective from January 5, 1978, to January 5, 1981. At inception, the named insureds on policy CBP68982 were Jean, Robert, and Jean and Lucy trading as Carduner's Liquor Store A/T/I/M/A.[3] Effective June 1, 1979, the named insureds on policy CBP68982 were amended to "Carduners Liquor Store, Inc. and/or Jean . . . and Lucy . . . A/T/I/M/A."

---

[3] A/T/I/M/A stands for "as their interests may appear."

A second Continental policy, issued by Glen Falls, became effective on January 5, 1981, and was cancelled effective January 5, 1982. The named insureds on policy CBP316215 were "Carduners Liquor Store, Inc. and Jean . . . and Lucy . . . A/T/I/M/A." The claims alleged by the Carduner Parties in their second amended complaint against Continental were made under policies CBP68982 and CBP316215. In 1987, upon Lucy's death, Robert was appointed executor of her estate and deeded Lucy's interest to Jean in January 1988.

C.

The 1990 Environmental Claim and 1994 Field Directive and Administrative Consent Order

In June 1990, tetrachloroethylene (PCE), a dry-cleaning solvent, was discovered in the drainage sumps of the property owned by Carduner and was linked to Ramp, the Carduner Parties' tenant. At about the same time, a fuel oil leak was discovered at the property.[4] The Carduner Parties' insurance agent was notified and issued general liability loss notices to their insurance carriers, including North River and Continental. The loss notice named Jean and Lucy

_____

[4] The exact date of the discovery is not clear in the record. The general liability loss notice sent to North River was dated October 5, 1990, and indicates the fuel oil leak was discovered in June 1990. The 2021 Agreement further establishes the contamination was found some time in June 1990. However, counsel's certification attests that contamination was found on October 10, 1990.

6

as the insureds. The loss notice indicated that fuel oil had been found in the ground water and it had determined to have occurred over an extended time. The loss notice further stated the contamination was discovered on adjacent property that came from a leak from the Carduner Parties' underground oil tank.

On October 5, 1990, North River received a general liability loss notice under the North River policies regarding an oil leak discovered on adjacent property, which allegedly emanated from an underground storage tank present on the property (the 1990 Environmental Claim). On October 24, 1990, Continental acknowledged receipt of such notice. In January 1991, after Jean's death, Robert was appointed executor of his estate.

On March 30, 1994, the New Jersey Department of Environmental Protection (NJDEP) issued a Field Directive to Robert finding he was responsible for the discharge of the heating oil and PCE.[5] The Field Directive expressly directed Robert to "[i]nitiate treatment of contaminated ground water, dispose of all contaminated soil stockpiled at the site at an approved facility and remediate any hazardous vapors occurring within the basements of buildings on the above mentioned property."

---

[5] In the Estate of Jean and Lucy's response to North River's statement of undisputed material facts, it incorrectly asserted that the Field Directive named the estate as the owner.

On April 21, 1994, the NJDEP issued an Administrative Consent Order (ACO) to Robert, individually, and as owner of the Ramp site located at the Carduner's shopping center. The ACO was also issued to respondents Paul Gangi and Michael Vernoia, the co-owners and operators of Ramp. The ACO states "the remediation required . . . will include all contaminants at the . . . [s]ite, and all contaminants . . . emanating from . . . the [s]ite."

Cleaning up the heating oil was resolved; afterwards, the remediation activities focused solely on the cleanup of PCE and chlorinated solvent contamination that emanated from the Ramp site. The Carduner Parties retained a Licensed Site Remediation Professional (LSRP) to address the remediation and cleanup. On August 8, 2022, the LSRP—Tellurian Environmental Management—issued an Environmental MIHPT[6] Summary "developing volume estimates for PCE in the [s]ite's subsurface."

The summary detailed the LSRP's soil sampling efforts at the "[f]ormer Ramp [c]leaners," and stated that it contains the required data to design and implement a remedial action for soil and groundwater to affect a removal of chemical contamination, which is solely attributable to Ramp. The summary

---

[6] Membrane Interface/Hydraulic Profiling Tool.

A-3014-22

discussed that excavation may be sufficient to remove all of the impacted soil, and in-situ[7] remediation should be able to address any remaining impacts.

D.

Disputed Ownership of the Ramp Cleaners' Site

Robert never challenged the ACO's identification of him as owner of the Ramp site. However, in the Carduner Parties' merits brief and in their statement of undisputed material facts submitted in support of their motion for summary judgment, they contend the site at the time—from discovery of the contamination until the transfer of the site to Carduner Front, LLC (Carduner Front) in 1998—was owned by Jean's Estate. On October 21, 2015, this issue was raised at oral argument.

From 1995 until 2005, the carriers shared the investigation and interim remediation costs of the property. In October 1998, Robert, as executor of Jean's will, deeded his interest in the property to Carduner Front. In 2000, the Carduner Parties and Ramp entered into an agreement regarding the allocation of remediation costs.

---

[7] In-situ is defined as, "[i]n the original place." Webster's II New College Dictionary 573 (1995)

E.

The 2010 Settlement Agreement and Release

On May 27, 2010, Carduner Front, Ramp, and various insurers, including Continental and North River, entered into a Settlement Agreement and Release (the 2010 Agreement) regarding environmental cleanup at the property. The 2010 Agreement resolved the litigation between the Carduner Parties and Continental regarding Continental's obligation to pay for remediation under the insurance policies and Continental's third-party complaint against North River and Ramp's carriers regarding the allocation of defense and indemnity obligations related to pre-2010 remediation. The Agreement also released potential bad faith claims.

Under the 2010 Agreement, prior to the exhaustion of the indemnity limit, Ramp's carriers agreed to pay seventy-five percent of the investigative and remedial costs and the Carduner's carriers agreed to pay twenty-five percent; after the exhaustion of the indemnity limit, the Ramp's carriers would pay seventy percent and Carduner's carriers would pay thirty percent; and no carrier would be required to pay after the indemnity limits of all of its policies have been exhausted. The 2010 Agreement had an initial three-year term with a consecutive renewal. All parties agreed that "[t]he goal of the remediation is to

take all reasonable efforts necessary to induce the NJDEP and/or LSRP to issue a No Further Action [l]etter at the site within the three[-]year period covered by" the 2010 Agreement.  In 2010, Continental opted out of the 2010 Agreement.

After execution of the 2010 Agreement, the carriers selected Roux Associates as the LSRP.  The carriers explored different remedial designs, including a traditional removal action and in-situ remedies—particularly a thermal treatment whereby electricity passes through the ground, separating the chlorinated solvents, which are boiled off in the groundwater and collected beneath the structures.  Further investigation, however, indicated that contamination beneath the property was much deeper than previously thought.  Therefore, Roux concluded excavation was not an appropriate remedy because it would disturb the parking lot and require closure of the shopping center.

Given Roux's conclusion, the carriers hired Current Environmental Solutions (CES) to design a thermal clean-up remedy for the property.  By August 2012, after a pilot study, CES was optimistic that a thermal remedy was feasible.  On June 17, 2013, CES estimated the remediation would cost $6,441,006 with a night and weekend surcharge to mitigate disruption to the tenants at the property, and $6,188,035 if work was completed during normal

11

business hours.  The carriers did not execute contracts with CES.  Instead, they sought a less expensive alternative with another company, TerraTherm.

TerraTherm initially stated that "[i]t is not expected that occupancy in the floors above the well field will be affected and should be able to continue operations."  However, on February 14, 2014, TerraTherm's proposed remediation concluded the tenants would be disrupted after all.  Pursuant to section eight of the 2010 Agreement, the parties decided to mediate their differing aims of lowering remediation costs and mitigating disruption to the tenants.

On September 4, 2014, mediation was attempted but was unsuccessful. On October 24, 2014, pursuant to section 6(a) of the 2010 Agreement, North River exercised its contractual right to opt out, thereby terminating the 2010 Agreement.

## F.

### The North River Action

On September 3, 2014, North River filed a declaratory judgment action against Carduner Front in the Law Division (North River Action) seeking a declaration of no coverage for liabilities related to site contamination at the property.  After Carduner Front unsuccessfully moved to dismiss the North

River action, it filed an answer, counterclaim, and a third-party complaint. The third-party complaint alleged five causes of action against North River: (1) breach of an insuring agreement as to a third-party beneficiary (count one); (2) unjust enrichment (count two); (3) duty to reimburse Carduner Front for access acquired through misrepresentation (count three); (4) breach of settlement agreement (count four); and (5) negligent supervision of remediation consultants (count five).

G.

The Carduner Parties' Action

On December 8, 2014, the Carduner Parties filed their own declaratory judgment action in the Law Division (the Carduner Action), naming Ramp, the Ramp carriers, North River, and Continental as defendants. On February 5, 2015, the Carduner Parties amended their complaint to allege six causes of action against North River and Continental: (1) declaratory judgment (count two); (2) failing to perform under the 2010 Agreement fairly and in good faith (count four); (3) failing to fulfill their policy obligations fairly and in good faith (count five); (4) for material misrepresentations during the negotiation and performance of the 2010 Agreement (count seven); (5) recovery under the Spill

Act,[8] N.J.S.A. 58:10-23.11(f)(a)(2) (count eight); and (6) a declaration of rights (count nine). On January 23, 2015, the North River and Carduner declaratory judgment actions were consolidated.

## H.

## The October 21, 2015 Orders

On June 5, 2015, North River filed three motions: (1) seeking dismissal of all claims brought by Carduner Front and Robert, individually, and all extra-contractual counts (counts four, five, seven, eight, and nine of the amended complaint); (2) seeking dismissal of Carduner Front's counterclaims in the North River action; and (3) for summary judgment declaring that the North River policies did not provide coverage to Carduner Front or Robert, and they were not named insureds.

On June 10, 2015, Continental joined the motion to dismiss filed by North River and filed its own motion to dismiss. Specifically, Continental sought to narrow the issues by moving to dismiss all Carduner Front's claims under the Glens Falls policies and Robert's claims for post-June 1, 1979 coverage under the same policies. In addition, Continental sought dismissal of counts four, five,

_____

[8] New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24.

seven, eight, and nine of the amended complaint, which included claims for bad faith, unjust enrichment, misrepresentation, contribution under the Spill Act, and statutory access.

On October 21, 2015, the motion court granted virtually all North River's requested relief,[9] including the dismissal of all pre-2010 extra-contractual claims against North River, leaving only the claims by the estates.

On October 21, 2015, the motion court granted Continental's motion, dismissing all Carduner Front's and Robert's claims for post-June 1, 1979 coverage. Additionally, the motion court: (1) granted North River's motion to dismiss the counterclaim filed by Carduner Front in the North River action; (2) granted North River's motion for summary judgment in the North River action, concluding that Carduner Front was not an insured under any of the North River policies and that North River has no liability to Carduner Front for any costs associated with the property, including, but not limited to, claims for lost rental or business income; (3) granted North River's motion to dismiss all counts by Carduner Front and Robert, individually, as against North River; and (4) granted

_____

[9] To the extent they could do so, the order permitted the Carduner Parties to plead post-2010 unjust enrichment or bad faith claims in an amended complaint.

North River's motion to dismiss counts four, five, seven, eight, and nine of the Carduner action.

I.

The Carduner Parties' Second Amended Complaint

On January 30, 2017, the Carduner Parties filed a second amended complaint, which alleges that: "[a] former tenant, Ramp . . . contaminated the soil and groundwater of the property with [PCE] and other chlorinated solvents." The second amended complaint also alleges that "[t]he recent technical work at the site definitively establishes Ramp as the sole responsible party for the [PCE] contamination." In addition, the second amended complaint alleges that the "Ramp defendants are . . . responsible to indemnify and hold the [Carduner Parties] harmless from the cost of remediating and investigating the property," and that "Ramp and [its owners] are 100% liable for all of the [PCE] contamination present on or beneath the Carduner's property."

J.

The 2018 Motion and Cross-Motion for Summary Judgment

On August 3, 2018, after successfully moving for summary judgment dismissing the coverage claims by the other Carduner Parties, North River and Continental jointly moved for summary judgment against the estates. A case

16

management order expressly provided for the filing of such a motion, "solely related to the issue" of whether the estates should be dismissed as plaintiffs because they lacked any underlying liability. The insurers—North River and Continental—asserted that the estates had incurred no losses, faced no claims, and thus had no basis for seeking coverage. North River and Continental maintained Ramp was the "actual polluter" and was fully funding the contamination remediation. On September 11, 2018, the estates cross-moved for summary judgment seeking a determination that it could assert claims against North River and Continental.

On November 9, 2018, the motion court conducted oral argument on the motion and cross-motion and reserved decision. On November 27, 2018, an order was entered denying North River's and Continental's motions for summary judgment, granting Robert's cross-motion for summary judgment insofar as the motion court "determined that there is potential legal liability on the part of the [e]states of Jean and Lucy . . . under the . . . Spill Act for the contamination that is the subject matter of this lawsuit such that they may assert insurance coverage claims against the North River and Continental insurance policies at issue." The motion court also referred the matter "back [to] mediation" to see if remaining coverage issues and defenses could be resolved.

17

K.

The 2021 Settlement Agreement

On or about November 18, 2021,[10] Ramp, the Ramp carriers, and the Carduner Parties entered into the 2021 Agreement. The second amended complaint states the Carduner Parties received a site cleanup estimate amounting to $6,441,006 for full scale remediation using electronic resistance heating.[11] By the time of the 2021 Agreement, the parties agreed that "the currently operating groundwater recovery and treatment system at the [s]ite [was] ineffective and should be eliminated, but they disagree[d] as to which remedy is appropriate for the [s]ite." Under the 2021 Agreement, the Carduner Parties received $8,662,500 from Ramp's carriers to remedy the contamination.

The 2021 Agreement includes the following "Judgment Reduction Provision," which states:

> In the event any [c]laim related to or arising out of a [r]eleased [c]laim is brought by . . . [the] Carduner Part[ies] against an entity that is not a party to this [a]greement, and such [c]laim results in an adjudication on the merits, whether in court or another tribunal with

---

[10] The 2021 Agreement states the date is November 18, 2021; however, the parties signed it by December 8, 2021.

[11] $6,441,006 accounted for a night and weekend surcharge; the estimate was $6,188,035 if the work was completed during normal business hours.

jurisdiction, and the recovery the Carduner Part[ies] obtain[] against such other entity includes amounts allocable to a [r]eleasing [p]arty, then the Carduner Part[ies] agree[] that it will not seek to obtain payments from such other entity or to enforce any related judgment to the extent of any sum that represents the applicable [r]eleasing [p]arty's share of the obligation owed, but rather, the Carduner Part[ies] shall voluntarily reduce any judgment, or claim against, or settlement with, such other entity by the amount, if any, that a court or tribunal determines that the applicable [r]eleasing [p]arty would have been liable to pay such other entity. To ensure that such a reduction is accomplished, the [r]eleasing [p]arties shall be entitled to assert this paragraph as a defense to any action against it for any such portion of the judgment or claim and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the [r]eleasing [p]arties from any liability for the judgment or [c]laim. In addition, the Carduner Parties agree they will not seek to obtain payment from any other person or entity of any amount or portion of any amount that a court or tribunal finds attributable or allocable to a [r]eleasing [p]arty.

[Emphasis added.[12]]

The "Releasing Parties" are defined in the 2021 Agreement as follows:

(a) the Ramp Entities; (b) the Carduner Parties, (c) Great American on behalf of itself and the Great American Companies, (d) Eagle Star on behalf of itself and the Eagle Star Companies, (e) Sentry on behalf of

---

[12] North River's and Continental's summary judgment motions relied on the emphasized language, but it was never addressed in the Carduner Parties' opposition or cross-motion.

A-3014-22

itself and the Sentry Companies, and (f) PLIGA[13] on behalf of itself and the PLIGA Parties.

The "Carduner Parties" are defined in the 2021 Agreement as:

(a) Carduner Front LLC, Carduner Back, LLC and Brix & Mortar, LLC, and each of their past, present, and future, direct and indirect, parents, subsidiaries, and affiliates, and each of their respective directors, officers, members, managers, employees, agents, attorneys, representatives, predecessors, successors, and assigns; and (b) Robert Carduner, the Estate of Jean Carduner and the Estate of Lucy Carduner, and each of their respective past, present, and future[] managers, employees, agents, attorneys, representatives, predecessors, successors, heirs, and assigns.

The 2021 Agreement defines "claims" as:

any and all past, present, or future, known or unknown, fixed or contingent, matured or unmatured, liquidated or unliquidated, anticipated or unanticipated, foreseen or unforeseen, direct or indirect, accrued or unaccrued, claims, causes of actions, cross-claims, liabilities, rights, demands (including letter-demands, notices, or inquiries from any [p]erson), penalties, assessments, damages, requests, suits, lawsuits, costs (including attorneys' fees and expenses), interest of any kind, actions, administrative proceedings, criminal proceedings, or orders, of whatever nature, character, type, or description, whenever and however occurring, whether at law or in equity, and whether sounding in tort or contract, or any statutory, regulatory or common law claim or remedy of any type.

---

[13] New Jersey Property and Liability Insurance Guarantee Association.

The 2021 Agreement defines "Released Claims" as the claims released in Section II and identifies the following released claims:

1. Claims that were or could have been asserted in the [l]itigations, including any claims for costs, expenses or fees;

2. Claims resulting from groundwater contamination on or emanating from the [s]ite;

3. Claims alleging any violation (whether or not in bad faith) of any statute, regulation, or common law doctrine or rule of bad faith or extra-contractual liability, including, without limitation, Unfair Claim Practices Acts[14] or similar statutes of each of the fifty states (where applicable) under, arising out of or relating to the [p]olicies;

4. Claims alleging any negligent undertaking by the [r]eleasing [p]arties under, arising out of or relating to the [p]olicies but expressly reserving any and all claims against Roux for negligence or intentional acts; or

5. Claims alleging any breach of contract, failure to abide by any duty or obligation, nondisclosure, misconduct[,] or alleged bad-faith committed by the [r]eleasing [p]arties arising out of or relating to the [p]olicies or the [p]ast [a]greements;

6. Claims by any of the Carduner Parties for (a) rent allegedly lost or forfeited, (b) payment for the Ramp Parties' use of the premises at the [s]ite, (c) money allegedly owed by the Ramp Parties to any

---

[14] See New Jersey Unfair Claims Settlement Practices Act, N.J.S.A. 17B:30-2.

of the Carduner Parties under the [p]ast [a]greements, (d) any other sum of money or non-monetary relief that the Ramp Parties owe, owed, or ever will owe to any of the Carduner Parties arising out of the subject matter of the [l]itigation; and

7. Claims alleging any mischaracterization of any payment made by a Ramp Carrier in connection with the [r]emediation as defense costs, indemnity costs or otherwise.

All claims against the insurers in the second amended complaint relate to the contamination caused by Ramp at the property.

L.

The March 31, 2023 Motion and Cross-Motion for Summary Judgment

Construing the 2021 Agreement as dispositive, and upon learning that an apparent conflict of interest had developed on the part of the mediator, North River withdrew its consent to mediation. In that regard, North River could withdraw from mediation pursuant to terms of the mediator's retention, which the mediator acknowledged.

On February 3, 2023, North River filed a motion for summary judgment seeking to enforce the terms of the 2021 Agreement, which Continental joined. North River and Continental argued that as a condition of the Carduner Parties receiving the sum of $8,662,500 from the Ramp carriers to remedy the

contamination, which was "significantly more" than the $6,441,006 they sought to recover in this lawsuit, the Carduner Parties were required to relinquish all claims against Ramp, the Ramp Carriers, and the insurers, which have "valid cross-claims" against Ramp and its carriers. Notwithstanding the "Judgment Reduction Provision" in the 2021 Agreement, and after receiving the settlement funds, North River and Continental maintained the Carduner Parties continued to pursue their claims against them. The Carduner Parties then cross-moved for summary judgment to dismiss their cross-claims against Ramp.

On March 31, 2023, the motion court conducted oral argument on the motions and cross-motion for summary judgment. At the conclusion of oral argument, the motion court granted summary judgment in favor of North River and Continental, dismissing all claims against them, and denied the Carduner Parties' cross-motion for summary judgment.

In its oral opinion placed on the record on March 31, 2023, the motion court ruled that the last sentence in Section III on page twelve of the 2021 Agreement was dispositive, eliminating, or waiving any claim that the Carduner Parties, estates, or any other Carduner entity had asserted in this litigation against the Carduner carrier defendants—North River and Continental. The motion court highlighted the following section from the 2021 Agreement:

. . . the Carduner Parties agree they will not seek to obtain payment from any other person or entity of any amount of portion of any amount that a court or tribunal finds attributable or allocable to a [r]eleasing [p]arty.

The motion court determined this provision, coupled with the inclusion of the Carduner entities in the definition section of "Released Parties" in the 2021 Agreement, effectuated a complete release in favor of North River and Continental. A memorializing order was entered.

M.

The May 11, 2023 Motion for Reconsideration

The Carduner Parties moved for reconsideration of the motion court's March 31, 2023 order. On reconsideration, the Carduner Parties raised new facts and argued concerning a reservation of rights provision contained in Section VI(F) in the 2021 Agreement. That reservation states: "This Agreement does not create any rights in any person or entity other than the [p]arties. Nothing in this Agreement affects any rights that the Carduner Parties may have against their insurers." The Carduner Parties contended that the reservation can only be construed to preserve their pending claims in this lawsuit, and which had been sustained through North River's prior motion for summary judgment filed in 2018.

On May 11, 2023, the motion court conducted oral argument. Following argument, the motion court denied the Carduner Parties' motion for reconsideration on the basis the Carduner Parties raised new facts and arguments that were not presented at the time the motions for summary judgment were submitted and decided and entered a memorializing order. This appeal followed.

On appeal, the Carduner Parties present the following issues for our consideration:

> (1) the motion court correctly reconsidered its March 30, 2023 ruling even though it ultimately reached the wrong result;
>
> (2) the Carduner Parties intended to preserve their existing claims against North River and Continental in the 2010 Agreement involving Ramp;
>
> (3) North River's and Continental's motions for summary judgment were procedurally defective and that defect caused a chaotic briefing and discussion of the issues;
>
> (4) the motion court erred in denying the Carduner Parties' cross-motion for summary judgment;
>
> (5) the motion court had ruled that there was coverage under the Carduner policies and North River and Continental and, therefore, North River and Continental faced only breach of contract claims or equitable claims not prohibited by the judgment reduction provision of the settlement agreement; and

25

(6) the motion court should not have dismissed claims related to the policies issued to Carduner Liquor Store, Inc.

## II.

We review a court's decision on a motion for summary judgment de novo, applying the same standard as the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). We must consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Ibid. (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)); see also R. 4:46-2(c).

We review the denial of a motion for reconsideration under an abuse of discretion standard. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). We will not disturb a judge's denial of a motion for reconsideration absent "a clear abuse of discretion." Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015) (citing Hous. Auth. of Morristown v. Little, 135 N.J. 274, 283 (1994)).

Reconsideration "is not appropriate merely because a litigant is dissatisfied with a decision of the court or wishes to reargue a motion." Palombi v. Palombi, 414 N.J. Super. 274, 288 (App. Div. 2010). Rather, reconsideration

26

should be utilized only for those cases which fall into that narrow corridor in which either (1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or (2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence.

[Ibid. (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)).]

"A contract arises from offer and acceptance and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992) (quoting Borough of W. Caldwell v. Borough of Caldwell, 26 N.J. 9, 24-25 (1958)). "Courts enforce contracts 'based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) (quoting Caruso v. Ravenswood Devs., Inc., 337 N.J. Super. 499, 506 (App. Div. 2001)). The agreement "must be considered in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose." Joseph Hilton & Assocs., Inc. v. Evans, 201 N.J. Super. 156, 171 (App. Div. 1985).

"A subsidiary provision is not so to be interpreted as to conflict with the obvious 'dominant' or 'principal' purpose of the contract." Newark Publishers'

Ass'n v. Newark Typographical Union, 22 N.J. 419, 426 (1956). "The plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020) (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)).

"The interpretation of a contract is generally subject to de novo review." Arbus, Maybruch & Goode, LLC v. Cohen, 475 N.J. Super. 509, 515 (App. Div. 2023). "The judicial task is simply interpretative; it is not to rewrite a contract for the parties better than or different from the one they wrote for themselves." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011).

Nevertheless, "we permit a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties." Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 270 (2006); see also Renee Cleaners, Inc. v. Good Deal Super Mkts. of N.J., Inc., 89 N.J. Super. 186, 190 (App. Div. 1965) ("In general, the polestar of construction is the intention of the parties as disclosed by the language used, taken in its entirety, and evidence of the attendant circumstances may be considered, not to change the agreement made but to secure light by which to measure its actual significance.").

A contract should be read "as a whole in a fair and common sense manner," mindful that "[d]isproportionate emphasis upon a word or clause or single provision does not serve the purpose of interpretation." Boyle v. Huff, 257 N.J. 468, 478 (2024) (first quoting Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009); then quoting Republic Bus. Credit Corp. v. Camhe-Marcille, 381 N.J. Super. 563, 568-69 (App. Div. 2005) (alteration in original)).

Accordingly, "[w]ords and phrases are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intent and purpose." Ibid. (quoting Republic Bus. Credit Corp., 381 N.J. Super. at 569 (alteration in original)). In Boyle, we recognized in the condominium association contract at issue that the indemnification provision read in isolation could support indemnification; however, our Supreme Court found after considering other provisions throughout the contract that indemnification was limited to third-party claims. Id. at 481-82.

A.

We first address the October 21, 2015 orders dismissing claims by the Carduner Parties against North River and Continental relative to policies issued to Jean and Lucy Carduner t/a Carduner Liquor Store and Carduner Liquor

Store, Inc., dismissing claims asserted by Carduner Front, LLC against North River and Continental, and denying the Carduner Parties' coverage claims against Continental and North River.

Our review of the record reveals the Carduner Parties state in their notice of appeal and their amended notice of appeal that they are appealing from the three orders dated October 21, 2015. However, the Carduner Parties did not address the October 21, 2015 orders in their merits brief. Thus, the Carduner Parties failed to comply with Rule 2:6-2, which addresses the required contents of an appellant's brief. They also failed to comply with Rule 2:6-1(a)(1)(I), which requires "a statement of all items submitted to the court on the summary judgment motion" to be included in the appendix.

We decline to consider issues that are not formally briefed. See, e.g., In re Bloomingdale Convalescent Ctr., 233 N.J. Super. 46, 49 n.1 (App. Div. 1989) (dismissing an appeal that was not briefed). See also State v. D.F.W., 468 N.J. Super. 422, 447 (App. Div. 2021) (disallowing consideration of issues not formally briefed by defendant). In light of these deficiencies, we affirm the October 21, 2015 orders.

A-3014-22

B.

The Carduner Parties also challenge the November 27, 2018 order denying, in part, their cross-motion for summary judgment against North River and Continental. As stated, North River's and Continental's motions for summary judgment were denied. The motion court held the estates may have "potential legal liability" under the . . . Spill Act for the contamination and thus may assert insurance coverage claims against North River and Continental. Before us, the Carduner Parties contend the November 27, 2018 order compelled North River to defend and indemnify them, subject to a reservation of rights. We reject this argument.

According to the Carduner Parties, the motion court "sustained" their claims against North River and Continental based on our decision in Metex Corp. v. Fed. Ins. Co., 290 N.J. Super. 95, 107 (App. Div. 1996). In Metex, the insured property had environmental contamination covered by a third-party comprehensive general liability insurance policy. Id. at 99-100. The insurer asserted it was not liable for the contamination because the NJDEP had not initiated enforcement proceedings and there was no proof of off-site contamination. Id. at 100.

The policy in <u>Metex</u>, however, was an occurrence, not a claims-made policy. <u>See</u> <u>id.</u> at 103. We therefore interpreted the word "damages" to include environmental response costs and remediation expenses. <u>Ibid.</u> (citing <u>Morton Int'l. Inc. v. Gen. Accident Ins. Co. of Am.</u>, 134 N.J. 1, 27 (1993)). In other words, the policy did "not require any 'enforcement,' 'claim' or 'suit' by a third[-]party in order to entitle the plaintiff to coverage." <u>Id.</u> at 104. Thus, we held that coverage for "damages," without any such limitation, extended to compliance with statutory mandates, including the Spill Act. <u>Ibid.</u>

As part of their arguments, the Carduner Parties stress that the motion court sustained their claims against North River and Continental under the <u>Metex</u> decision, however, the motion court failed to compel their insurance carriers to provide the defense the Carduner Parties were entitled to under <u>Metex</u>. The Carduner Parties argue the motion court should have granted such relief as a matter of law. They also maintain the motion court erred by denying their cross-motion for summary judgment on their breach of contract and unjust enrichment claims.

North River and Continental counter that unlike in <u>Metex</u>, here the NJDEP had issued an ACO ordering remediation, identified the responsible parties—Ramp as the polluter and Robert Carduner as the property owner—and imposed

no obligation on the Carduner Parties.  Further, North River and Continental argue that the responsible parties here undertook a site clean-up, fully funded by Ramp.

Based upon our de novo review, we conclude the facts in Metex are distinguishable from the facts in this matter.  The motion court allowed the Carduner Parties' claims to proceed against North River and Continental but specifically rejected the Carduner Parties' proposed order containing language requiring North River and Continental to defend and indemnify them.  Moreover, the motion court referred the matter back to the mediator to resolve the remaining issues.  Therefore, we conclude the motion court properly denied, in part, the Carduner Parties' cross-motion for summary judgment.  The record justified that decision, and we therefore affirm the November 27, 2018 order.

C.

Next, we address the Carduner Parties' argument that the motions for summary judgment were procedurally defective because they were filed without the motion court's permission at a time when its case management orders had directed mediation.  However, the Carduner Parties fail to cite to any orders that precluded North River and Continental from filing summary judgment motions when they did.

33

Moreover, North River was no longer involved in the mediation because it opted out by the time its summary judgment motion was filed. We conclude the motion court was within its discretion to permit the summary judgment motions to proceed under Rule 1:1-2(a), which provides that "any rule may be relaxed or dispensed with by the court in which the action is pending." We also discern no prejudice because the Carduner Parties cross-moved for summary judgment. Therefore, we reject the Carduner Parties' argument that the motions for summary judgment were procedurally defective.

D.

The Carduner Parties also argue that the motion court correctly reconsidered its March 30, 2023 ruling even though it ultimately reached the wrong result. In that vein, the Carduner Parties contend the 2021 Agreement reflects their intent to preserve their claims against their own insurance carriers—North River and Continental. They further assert the motion court's reading of the Judgment Reduction Provision in the 2021 Agreement contradicts a material term in section VI(F) because it renders that provision meaningless. The Carduner Parties contend section VI(F) excludes existing claims against their insurers from the impact of the Judgment Reduction Provision.

34

The Carduner Parties point to the text of section VI(F), "nothing in this Agreement affects any rights that the Carduner Parties may have against their insurers," which they contend preserved their intent to assert claims against North River and Continental. The Carduner Parties contend the drafting history of the 2021 Agreement supports their position, and preservation of their claims against North River and Continental was "paramount" to them during the mediation process.

The Carduner Parties spotlight the language from the initial draft of the 2021 Agreement in June 2021, to the final draft of the 2021 Agreement and argue the language in section VI(F) is "identical" in each succeeding draft. According to the Carduner Parties, this history demonstrates the "material nature" of section VI(F) as a "precondition" to their agreement to mediate. The Carduner Parties also point out that that section III(A) of the 2021 Agreement—the Judgment Reduction Provision—was only intended to address liability "attributable or allocable to Ramp and the Insurance Companies." In addition, the Carduner Parties assert that section VI(F) does not render section III(A) meaningless, considering the number of potential third parties who could be impacted by claims.

North River and Continental counter they are not parties to the 2021 Agreement. They rely on the Judgment Reduction Provision that states:

> In addition, the Carduner Parties agree that they will not seek to obtain payment from any other person or entity of any amount of portion of any amount that a court or tribunal finds attributable or applicable to a Releasing Party.

North River and Continental also responded that the Carduner Parties are included within the definition of "Releasing Parties" contained in the 2021 Agreement, and they are precluded from seeking recovery against anyone, including the insurers, for any amount attributable or allocable to the "Releasing Parties." North River and Continental contend they are third-party beneficiaries of the Judgment Reduction Provision and are thereby protected against any claims brought by the Carduner Parties against an entity—such as their insurers—who are not parties to the 2021 Agreement.

This dispute before us boils down to a disagreement over whether the terms of the 2021 Agreement bar the present claims by the Carduner Parties against North River and Continental. North River and Continental moved for summary judgment based on their interpretation of the plain language of the 2021 Agreement. The court's task is to determine the intended meaning of the release-related language, as expressed within the 2021 Agreement.

36

The 2021 Agreement is only between the Carduner Parties and the Ramp parties. Those parties are clearly defined in the 2021 Agreement. The Ramp parties include the dry-cleaning company and its insurers. There is no dispute that North River and Continental are not parties to the 2021 Agreement. Moreover, releases were only given to the parties to the 2021 Agreement, which we reiterate, did not include North River or Continental. Therefore, we are convinced the Carduner Parties' claims against North River and Continental were not released or precluded by the 2021 Agreement.

North River and Continental also misconstrue the cited Judgment Reduction Provision. That language is only triggered when "a court or tribunal finds" that some other entity might be required to pay what is "allocable to a Releasing Party." It is plainly stated that a court or tribunal has to make that determination. Consequently, we conclude the Carduner Parties can pursue their claims against North River and Continental, and the 2021 Agreement does not bar those claims. Ultimately, if the Carduner Parties obtain a judgment, the court or tribunal granting that judgment will have to determine if any of that amount is the responsibility of Ramp or its carriers and then deduct that amount from the judgment.

37

Based upon our de novo review, we reverse and vacate the March 31, 2023 order granting summary judgment to the Carduner Parties' insurers and the May 11, 2023 order denying reconsideration.

## III.

This matter is remanded, and the Carduner Parties can pursue their pending claims against North River and Continental. As already noted, if the Carduner Parties are successful on their claims, the motion court will need to determine whether that recovery is "attributable or applicable to a Releasing Party" under the 2021 Agreement, and, if so, deduct that amount from the recovery.

Affirmed in part, reversed and vacated in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3014-22